## Case No. 12,893.

### SIMS v. MARINERS.

[2 Pet. Adm. 393.] [1]

District Court, D. Pennsylvania. 1807.

SEAMEN—DESERTION—CONFINEMENT AT INSTANCE OF MASTER—VOYAGE BROKEN UP.

1. The mariners had deserted from a ship on shore and in a perilous situation, and were confined at the instance of the master. The judge considered the voyage broken up by the misfortunes of the ship, and discharged the mariners from imprisonment.

[Cited in The Dawn, Case No. 3,666.]

2. Seamen deserting a vessel under circumstances of distress or danger [are] answerable for the damages which may be sustained in consequence of their dereliction of duty, and lose their wages.

PETERS, District Judge. Ten mariners, of the ship Woodrop Sims, were committed by the mayor of the city of Philadelphia, on the oath of the owner of that vessel [Joseph Sims], charged with deserting the ship on her out passage and being absent without leave. The act of congress for the government of seamen in the merchants' service, directs, that this shall be done "upon the complaint of the master," which did not appear to have been made directly, though a letter from the master was produced, requesting the owner to have the seamen apprehended as deserters. It was conceded by the owner, that the vessel was cast on shore in the Bay of Delaware; and lay in a doubtful and perilous situation; though hopes were entertained at some times, and doubts at others, that she would be got off. The latest accounts were very unfavorable. Bail was offered for one of the seamen. Another mariner, though involved in the general charge of desertion, was admitted to prove a permission to the one tendering bail from the master, to leave the ship. The witness was so admitted, because, though involved in the same charge, cases of individuals might differ in their circumstances, and the testimony given could have no operation to excuse the witness, though it might acquit the other: and it did not follow, that every individual would be admitted to be a witness. No such combination would be countenanced.

It was contended, that a commitment of seamen for desertion, was in the nature of an execution; and not of process for trial or examination. That the justice had the power to decide, and the commitment was final, and precluded any discharge, either on

---

[1] [Reported by Richard Peters, Jr., Esq.]

bail, or liberation from confinement entirely, except when the master required the discharge; and then, only for the purpose of delivery to the master.

The seamen had signed the articles or "contract;" and the voyage agreed for was "not finished," but was interrupted, by the casualty and misfortune which had befallen the ship.

Bail was not taken; because there appeared some reason to doubt the permission to the mariner, as stated by the witness; whose testimony aimed at proving a general discharge of the whole, the seaman requiring his release on bail included.

The judge conceived, that in cases of such commitments, where special circumstances warranted exceptions, bail might be admitted; although the words of the law appeared strict and peremptory. He agreed that, in ordinary cases, where vessels were in capacity to "proceed on the voyage," a strict construction might be justified. So that no discharge, under common circumstances, should be granted, but for the purpose directed in the mariners' act. Yet, in a case where a fatal interruption of the voyage could be proved, testimony might be admitted, under the words "or the contract otherwise dissolved," to shew that the voyage "was dissolved" by the wreck of the vessel, which had occasioned a total incapacity to proceed to sea. Proof was also admissible that the vessel was, when the seamen abandoned her, in a dangerous and hopeless situation; so that necessity (which in extreme cases supersedes the common operations of law) compelled a dereliction of service, for the safety of life.

The commitment is not indefinite. The words of the law are, "shall commit him to the house of correction, or common gaol of the city, town or place, there to remain, until the said ship or vessel shall be ready to proceed on her voyage, or till the master shall require his discharge, and then to be delivered to the said master." But if the vessel shall be so disabled as not to be "ready to proceed on her voyage," or likely so to be, it can never be presumed that the confinement must endure, until the pleasure of the master induces him to "require the discharge."

It is the duty of seamen to abide by the vessel, as long as reasonable hope remains. If they abandon their duty, so that it can be proved that this dereliction occasioned a final loss, or temporary damage, where their exertions would have prevented the latter, or ultimately restored the ship to safety, the seamen lose their wages, and are answerable in damages. Yet their confinement under the commitment must cease, with the capacity of the vessel to "proceed on her voyage;" their amenability to answer in damages notwithstanding.

There being no legal or decisive proof of the present state of the vessel, and that she was incapacitated to proceed on her voyage, the seamen were remanded; that such proof, if practicable, should be adduced, as well as testimony to shew the state of the ship when the seamen left her; or permission to them, or any of them, to depart. Afterwards testimony was produced, proving that the ship was totally disabled, and not in a capacity to proceed on her voyage. The mariners were discharged.

NOTE. The Woodrop Sims was originally destined to Canton, but after the misfortune mentioned in this case and before the confinement of the seamen, she was abandoned to the underwriters by her owner, and thus the intended voyage was by him completely terminated. To the owner, every opportunity was offered to produce evidence of the actual situation of his ship at the time she was left by the mariners, as well as of every circumstance attending this transaction, but no testimony was adduced, nor was any further time to obtain it requested, when the case was heard after the adjournment. A considerable time after the discharge of the mariners, and with much expense and difficulty the ship was got off the shoals on which she had been wrecked and brought up to Philadelphia. These circumstances are stated in consequence of the case of The Woodrop Sims having been much misconceived, and the decision of the district judge greatly misrepresented.